# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00779-SCT

*HATTIESBURG HEALTH & REHAB CENTER,*
*LLC d/b/a HATTIESBURG HEALTH & REHAB*
*CENTER d/b/a HATTIESBURG HEALTH &*
*REHAB*

*v.*

*EMMA BROWN, INDIVIDUALLY, AS EXECUTOR*
*FOR THE ESTATE OF LEO A. BROWN, AND ON*
*BEHALF OF ALL WRONGFUL DEATH*
*BENEFICIARIES OF LEO A. BROWN*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2014 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| TRIAL COURT ATTORNEYS: | ROBIN L. ROBERTS |
| | MARJORIE S. BUSCHING SELF |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | S. MARK WANN |
| | MARJORIE SELBY BUSCHING SELF |
| | KELLY HOLLINGSWORTH STRINGER |
| ATTORNEYS FOR APPELLEES: | CHRISTOPHER D. NOBLES |
| | ROBIN L. ROBERTS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/13/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. A nursing home resident's wife signed an admission agreement that contained an arbitration provision. Her husband died soon after his discharge, and she brought a

wrongful-death suit against the nursing home, Hattiesburg Health & Rehab Center, LLC (HHRC).  HHRC moved to stay the proceedings and to compel arbitration.  The trial judge denied HHRC's motion, and HHRC appeals that denial to this Court.  We affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.    Leo Brown was admitted to HHRC in February 2012.  His wife, Emma, signed an admission agreement both in her individual capacity and on Leo's behalf.  Specifically, Emma's signature appears on a line just above the following language: "signature of responsible party in his/her individual capacity and on behalf of the resident in the following capacity," where Emma circled the "authorized agent and/or health care surrogate" option. Leo did not sign the agreement.

¶3.    Among other terms and conditions, the admission agreement contained an arbitration provision.  The provision provided, in pertinent part:

> **E.  ARBITRATION - <u>PLEASE READ CAREFULLY</u>**
>
> 1.  It is understood and agreed by the Facility and Resident and/or Responsible Party that any legal dispute, controversy, demand or claim (hereinafter collectively referred to as "claim" or "claims") that arises out of or relates to the Admission Agreement, any service or health care provided by the Facility to the Resident or any matter related to the Resident's stay shall be resolved exclusively by binding arbitration pursuant to the Federal Arbitration Act, to be conducted at a place agreed upon by the parties, or in the absence of such agreement, at the Facility, in accordance with the procedural rules of the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, and not by a lawsuit or resort to court process except to the extent applicable state or federal law provides for judicial review of arbitration proceedings or the judicial enforcement of arbitration awards.
>
> . . .

3.  This agreement to arbitrate includes, but is not limited to, any claim for payment, nonpayment or refund for services rendered to the Resident by the Facility, violations of any rights granted to the Resident by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice of any other claim based on any departure from accepted standards of medical or health care or safety whether sounding in tort or in contract.  However, this agreement to arbitrate shall not limit the Resident's right to file a grievance or complaint, formal or informal, with the Facility or any appropriate state or federal agency, including any state ombudsman assigned to the facility.

. . .

7.  ***The parties understand and agree that by entering this arbitration agreement, which binds both the facility and the Resident/Responsible party, they are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury.***

(Emphasis in original.)

¶4.    Leo was discharged from HHRC in July 2012, and he passed away on October 14, 2012.  The Jones County Chancery Court appointed Emma administratrix of Leo's estate in November 2013.  Emma then filed a complaint against HHRC in Forrest County Circuit Court in her individual capacity, as executor of Leo's estate, and on behalf of all of Leo's wrongful-death beneficiaries.  Emma alleged that Leo "sustained a specific injury, i.e. death, on October 14, 2012, due to respiratory failure secondary to a Stage IV decubitus ulcer he experienced under [HHRC's] lack of care and supervision."  Emma alleged claims of negligence, medical malpractice, and deviations from the standard of care, *respondent superior*, *res ipsa loquitur*, negligent supervision and retention and wrongful death.  She requested several categories of compensable damages, including funeral expenses, pain and

3

suffering, loss of enjoyment of life, and loss of society and companionship, as well as punitive damages for HHRC's "callous" and "grossly negligent" actions.

¶5.     HHRC answered with a motion to stay proceedings and compel arbitration. HHRC argued that the "language of the Admission Agreement clearly established that Leo Brown and Emma Brown were giving up their right to a trial by jury," and that all of the allegations in the complaint "arose out of Leo Brown's residency at the Facility and are subject to binding arbitration." Emma responded and argued that Leo did not execute the admission agreement, nor did he "imbue [her] with the authority to forfeit his right to civil litigation and a jury trial." Emma also alleged that the arbitration agreement was procedurally and substantively unconscionable.

¶6.     The trial judge held a hearing on HHRC's motion and denied it, stating: "I do not agree that [Emma] was authorized to sign on Mr. Brown's behalf, and I don't – I do not agree that it is binding on Mr. Brown." The trial judge later entered an order, finding again that the Admission Agreement was not binding on Leo:

> Leo A. Brown was not a party to the Admission Agreement and its embedded Arbitration Agreement due to his incapacity to understand and appreciate the contract or appoint another to act on his behalf. The Defendant's argument that Leo A. Brown is indirectly bound by the contract through estoppel, third-party beneficiary status, apparent authority, or as healthcare surrogate is unpersuasive based on the facts presented.
> . . .
> The Arbitration Agreement included in the Defendant's Admission Agreement is not binding on Leo Brown or his estate.

The trial judge also found that the arbitration agreement was unconscionable.

¶7.     HHRC now appeals to this Court and presents two issues:

4

1.	Whether the arbitration provision contained within the Admission Agreement entered between Emma Brown, individually and on behalf of Leo Brown, and [HHRC] creates a valid and enforceable agreement to arbitrate; and

2.	Whether the arbitration provision contained within the Admission Agreement entered between Emma Brown, individually and on behalf of Leo Brown, and [HHRC] is unconscionable.

We agree with the trial court that Leo is not bound by the arbitration provision. And because that issue is dispositive, we do not address HHRC's unconscionability argument.

## ANALYSIS

¶8.	This Court reviews the denial of a motion to compel arbitration *de novo*. *Adams Cmty. Care Center, LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010). This Court has "'endorsed the undisputed province of the Federal Arbitration Act'" and recognized its "'clear authority to govern agreements formed in interstate commerce'" where a contractual provision provides for arbitration. *Id.* (citations omitted). This Court alsohas ruled previously that the FAA is applicable to nursing-home admission agreements that contain arbitration clauses. *Id.*

¶9.	Under the FAA, courts employ a two-pronged inquiry when reviewing an arbitration agreement. *Id.* At issue here is the first prong,[1] which has two considerations: "'(1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement.'" *Id.* This Court applies the law of contracts to determine if a valid arbitration agreement exists. *Id.* "The elements of a contract are '(1) two or more

---

[1]The second prong is "whether external legal constraints foreclose arbitration of the claims." *GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562, 563 (Miss. 2013). But as mentioned, we do not reach HHRC's unconscionability argument.

contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" ***Id.*** (citation omitted) (emphasis added).

¶10.    HHRC argues that Leo is bound by the arbitration agreement under three theories:[2] (a) because he was the intended third-party beneficiary of the admission agreement; (b) because Emma executed the admission agreement as his healthcare surrogate, and (c) because the doctrine of direct-benefit estoppel prevents him from repudiating the arbitration provision.

## A. Leo is not a third-party beneficiary.

¶11.    HHRC argues first that "Mississippi Courts recognize the doctrine of third-party beneficiary in the context of nursing home admission agreements.  Non-signatories can be bound to an arbitration clause if determined to be a third-party beneficiary."  But HHRC cites only nonapplicable and/or nonbinding law to support this assertion.[3]

¶12.    What HHRC wholly failed to do, however, is discuss—or even cite—the two recent, unanimous opinions from this Court, in which this Court held that residents in almost identical factual scenarios were *not* third-party beneficiaries for purposes of enforcing an

---

[2]HHRC also alleges in passing that Leo is bound by Emma's execution of the admission agreement by general principles of agency law.  But HHRC does not expound upon that argument in its brief, nor does it cite any authority to support it.  We therefore decline to address it.

[3]HHRC cites the following: "***Forest Hill Nursing Ctr., Inc. v. McFarlan***, 995 So. 2d 775, 782 (Miss. Ct. App. 2008); ***Burns v. Washington Savings***, 171 So. 2d 322, 325 (Miss. 1965); ***Trinity Mission of Clinton, LLC v. Barber***, 988 So. 2d 910, 918 (Miss. Ct. App. 2007); ***Cook v. GGNSC Ripley, LLC***, 2011 WL 1439458 (N.D. Miss. April 14, 2011); ***Myers v. GGNSC Holdings, LLC***, 2013 WL 1913557 (N.D. Miss. May 8, 2013)."

arbitration provision. In **_Adams Community Care Center, LLC v. Reed_**, a resident's son signed an admission agreement containing an arbitration provision. **_Adams_**, 37 So. 3d 1155, 1156-57 (Miss. 2010). The resident's daughter then filed a complaint as her mother's conservator, and the nursing home moved to compel arbitration. **_Id._** at 1157. The trial judge denied the motion, and the nursing home appealed. **_Id._**

¶13. On appeal, this Court found first that the resident's sons did not have authority to bind her as her healthcare surrogate, nor did they have the apparent authority to do so. **_Id._** at 1158-60. This Court then specifically addressed whether the resident was a third-party beneficiary to the admission agreement and declined to find that she was, stating:

> For a third-party beneficiary to exist, there must first exist a valid contract executed by one with "legal capacity" to enter the contract. _See_ **_Grenada Living Ctr., LLC v. Coleman_**, 961 So. 2d 33, 36-37 (Miss. 2007). ACNC has failed to put forth any evidence of James or Larry Wesley's legal capacity to execute the admissions agreement. Therefore, Annie Reed cannot be a third-party beneficiary to the admissions agreement and subject to the arbitration provision.

**_Id._** at 1160.

¶14. And in **_GGNSC Batesville, LLC v. Johnson_**, this Court again was presented with the third-party beneficiary issue. There, a resident's sister signed an admission agreement and a separate arbitration agreement. **_Johnson_**, 109 So. 3d 562, 563-64 (Miss. 2013). After the resident passed away, his sister filed a complaint against the nursing home, which moved to compel arbitration. **_Id._** at 564. The trial court denied the motion, and the nursing home appealed. **_Id._** at 563-65.

¶15. On appeal, this Court found first that the resident's sister did not have apparent authority to contract for him. *Id.* at 565. This Court then went on to find that "[b]ecause a valid contract [did] not exist, a third-party beneficiary cannot exist." Thus, this Court concluded that it need not even *reach* the third-party-beneficiary argument, as no valid contract existed. *Id.* at 566.

¶16. These cases control here. Emma had no authority to contract on behalf of Leo (which we discuss below), so Leo cannot be a third-party beneficiary to a nonexistent contract. We find, based on the unequivocal holdings of this Court in *Adams Community Care* and *Johnson*, that Leo is not a third-party beneficiary to the admission agreement, and therefore cannot be bound by the arbitration provision under that theory.

**B. Emma was not Leo's healthcare surrogate.**

¶17. HHRC argues next that Emma executed the admission agreement on behalf of Leo as his healthcare surrogate. Under the healthcare surrogate statutes, a third party may make healthcare decisions for another, but only if certain prerequisites are met:

> A surrogate may make a health-care decision for a patient who is an adult or emancipated minor *if the patient has been determined by the primary physician to lack capacity* and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

Miss. Code Ann. § 41-41-211(1) (Rev. 2013) (emphasis added).

¶18. HHRC points out that Emma had attached medical records to her response to its motion to compel and had argued that those records showed that Leo was incapacitated. Thus, argues HHRC, Emma "cannot argue based upon Mr. Brown's medical diagnoses of his primary physicians he lacked capacity to contract for himself and at the same time assert

8

Mr. Brown had not been determined by the same physicians to lack capacity for purposes of the healthcare surrogate statute."

¶19. But this argument is easily dismissed, because there is simply no evidence in the record that Leo's primary physician ever made any capacity determination. It is true that Emma attached some medical records to her response to the motion to compel, but we found nowhere in the record where Leo's primary physician was even named, much less any indication that he or she had determined that Leo lacked capacity. And notably, HHRC does not argue that such a determination exists.

¶20. HHRC argues what perhaps can be best described as "substantial compliance" with the healthcare surrogate statute, but we are not convinced by that argument. In short, HHRC argues that Emma herself represented that Leo was incapacitated upon admission, and that that admission is sufficient under the surrogate statutes to transform her into Leo's surrogate. HHRC relies on this Court's opinion in *Covenant Health and Rehabilitation of Picayune, L.P. v. Brown*, 949 So. 2d 732 (Miss. 2007), *overruled on other grounds* by *Covenant Health and Rehabilitation of Picayune, L.P. v. Estate of Moulds,* 14 So. 3d 695 (Miss. 2009), to support its argument that the "health care statute was invoked and Leo Brown is bound to the contract by his health care surrogate's execution of the Admission Agreement, including the arbitration provision."

¶21. In *Covenant Health*, this Court did seem to sanction "substantial compliance" with the surrogate statutes, stating:

> Plaintiffs submit in their motion that Brown was incapable of managing her affairs at the time she entered the hospital. *Neither party presents a*

*declaration by Brown's primary physician stating that she was incapable of managing her affairs prior to the signing of the admission agreement, but Plaintiffs state in their motion that Brown's admitting physician at the hospital found that she did not have the mental capacity to manage her affairs. Seeing that Brown was incapacitated by virtue of admission by her representatives and corroboration by her admitting physician*, she was capable legally of having her decisions made by a surrogate. Her adult daughter, Goss, was an appropriate member of the classes from which a surrogate could be drawn, and thus, Goss could contractually bind Brown in matters of health care.

*Covenant Health*, 949 So. 2d at 736-37 (emphasis added). But even in light of this language, HHRC's argument still fails. First, *Covenant Health* is distinguishable, because there was at least some evidence in the record there that Brown's primary physician had made a capacity determination. Here, there is no such evidence.

¶22. Secondly and more importantly, this Court has since returned to a strict interpretation of the surrogate statutes:

*Our Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted: by a primary physician determining lack of capacity.* Miss. Code Ann. § 41-41-211(1) (Rev. 2009). As noted by Reed, Smith is not a physician, and her opinion is irrelevant to this inquiry under Section 41-41-211. Furthermore, there is no evidence in the record that Dr. Tillman was Annie Reed's primary physician or that he ever determined she lacked "capacity" as that term is defined under Section 41-41-203(h).7 *See also **Compere's Nursing Home, Inc. v. Estate of Farish ex rel. Lewis***, 982 So. 2d 382, 384 (Miss. 2008) (ruling "there is no evidence that Ms. Farish had 'been determined by [her] primary physician to lack capacity' "); *see also **Magnolia Healthcare, Inc. v. Barnes ex rel. Grigsby,*** 994 So. 2d 159, 162 (Miss. 2008) (Dickinson, J., concurring).

*This Court must follow the plain and unequivocal language of the statute and require that, in order for one to act as a health-care surrogate, there must first be a determination of a lack of capacity by a patient's primary physician.* Because there is no evidence that a primary physician found Annie Reed to be incapacitated, we hold that neither James nor Larry Wesley had authority to act as a health-care surrogate.

*Adams Community Care*, 37 So. 3d at 1159 (emphasis added). We therefore find that Emma did not have the authority to bind Leo as his healthcare surrogate.

### C. Leo is not bound by the doctrine of direct-benefit estoppel.

¶23. HHRC argues finally that Leo is estopped from denying the terms of the admission agreement because he received services from HHRC and benefitted from the terms of the agreement. As such, HHRC argues, Leo cannot now "repudiate" the terms of the arbitration provision.

¶24. HHRC relies almost exclusively on some language from this Court's decision in *Scruggs v. Wyatt*, 60 So. 3d 758 (Miss. 2011), in which this Court wrote:

> "Direct-benefit estoppel involve[s] non-signatories who, during the life of the contract, have *embraced the contract* despite their non-signatory status, but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) . . . . According to *Noble Drilling*, *"[a] non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract.*" *Noble Drilling*, 620 F.3d at 473 (citing *Hellenic*, 464 F.3d at 517-20) (emphasis added).

*Scruggs*, 60 So. 3d at 767-68 (internal citations omitted) (emphasis added). But we find that Leo did not "embrace" the admission agreement here.

¶25. First, there is simply no evidence that Leo "knowingly" did anything, much less knowingly "seek and obtain direct benefits" from the admission agreement. Emma consistently has maintained that Leo was incapacitated upon his admission to HHRC, and even HHRC concedes in its reply brief that "[b]ased upon Emma Brown's submissions, Leo

Brown clearly meets the definition of lacking 'capacity' under the [healthcare surrogate] statute."

¶26.    Second, we find that Leo's estate (through Emma) is not attempting to "enforce the terms" of the admission agreement, nor is it "asserting claims that must be determined by reference to it." Simply put, Leo's estate's claims sound in tort, and Emma could pursue those claims without an admission agreement at all. In our view, *Scruggs* is easily distinguishable. There, this Court found that

> [t]he foundation of Wyatt's lawsuit is premised upon a dispute with Nutt & McAlister over his compensation (fee share) directly tied to successful recovery by the Katrina Joint Venture against its client's insurers. *As such, Wyatt's claims against the Scruggs Defendants are directly dependent on the Katrina JVA, and require reference thereto.*

*Scruggs*, 60 So. 3d at 770 (emphasis added). So, in sum, we find that the doctrine of direct-benefit estoppel does not bar Leo here. He did not "knowingly" receive benefits from HHRC and then try avoid his obligations. Nor is his estate suing to enforce the terms of the admission agreement, because his claims are not "directly dependent" on the agreement.

¶27.    Because we find that no valid arbitration agreement exists, we do not address HHRC's unconscionability argument. *See Mississippi Care Center of Greenville v. Hinyub*, 975 So. 2d 211, 218 (Miss. 2011).

## CONCLUSION

¶28.    When reviewing an arbitration provision, this Court first must determine whether the parties have agreed to arbitrate. We find here that they did not, because Leo was not a third-party beneficiary to the admission agreement, Emma was not his healthcare surrogate, and

Leo was not bound by the doctrine of direct benefit estoppel.  Therefore, Leo is not bound by the arbitration provision, and we affirm the judgment of the Forrest County Circuit Court.

¶29.   **AFFIRMED**.

     **WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**