# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00145-SCT

*DEBRA TARVIN FOR AND ON BEHALF OF THE*
*WRONGFUL DEATH BENEFICIARIES OF*
*CALDWELL TARVIN*

*v.*

*CLC OF JACKSON, LLC d/b/a PLEASANT HILLS*
*COMMUNITY LIVING CENTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2014 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN, JR. |
| TRIAL COURT ATTORNEYS: | W. ERIC STRACENER |
| | MARGARET SAMS GRATZ |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | W. ERIC STRACENER |
| | W. ANDREW NEELY |
| ATTORNEYS FOR APPELLEE: | MARGARET SAMS GRATZ |
| | JOHN G. WHEELER |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 06/23/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND BEAM, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. On her father's behalf, Debra Tarvin signed a nursing home Admission Agreement

which contained an arbitration provision. After her father died, she brought a wrongful-death

suit against the nursing home, CLC of Jackson, LLC d/b/a Pleasant Hills Community Living

Center ("Pleasant Hills"). Pleasant Hills moved to dismiss the proceedings and to compel

arbitration. The trial judge granted Pleasant Hills' motion, and Debra now appeals to this Court. Because Pleasant Hills has not shown that Dr. Cassandra Thomas was Caldwell's primary physician, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

¶2. Caldwell Tarvin was admitted to Pleasant Hills in August 2007,[1] and Debra Tarvin signed an Admission Agreement as Caldwell's "Responsible Party." Janet Terrell and Annette Tarvin also signed the Agreement as "Family Members" but Caldwell did not sign the Agreement. Among other terms and conditions, the Agreement contained an arbitration provision.

¶3. Caldwell was admitted to the hospital in January 2011, where staff discovered "several serious and life-threatening bed sores all over his body." Caldwell ultimately passed away on May 8, 2011. Debra then filed a complaint against Pleasant Hills and Director of Nursing Andrea Hocutt on behalf of all of Caldwell's wrongful-death beneficiaries. Debra alleged that Caldwell "was allowed to develop several serious life-threatening decubitus ulcers," and that he also experienced "weight loss, infections, skin tears, dehydration and other neglect and abuse."

¶4. Pleasant Hills answered and asserted as its third defense "all protections provided by any arbitration agreement entered into" by Caldwell and/or his representatives. Several months later, Pleasant Hills filed a motion to dismiss proceedings and to compel arbitration

---

[1]The complaint alleges that Caldwell was a resident at Pleasant Hills from August 2009 until January 2011. But that entry date appears to be incorrect, as the Admission Agreement is dated August 27, 2007.

2

and a motion to stay discovery pending a ruling on its motion to compel. Pleasant Hills argued that the arbitration provision was not procedurally or substantively unconscionable and that Caldwell was the intended third-party beneficiary of the Admissions Agreement, which included the arbitration agreement. Pleasant Hills attached several documents to its motion, including some of Caldwell's medical records from just before his admission to Pleasant Hills in which physicians had noted that Caldwell had suffered a "mental status change" and was "obviously demented at this time."

¶5. Debra responded and argued that Pleasant Hills had waived its right to compel arbitration by participating in the litigation. Debra also argued that Pleasant Hills had "completely ignore[d] the issue of whether or not Mr. Tarvin's family members had the legal authority to bind him to an arbitration agreement[.]" Specifically, Debra argued that there was "no legal authority, such as a power of attorney or conservatorship" by which she could bind her father to the arbitration agreement, nor could she bind him under the Uniform Healthcare Decisions Act, because "the record is devoid of any evidence" that the physicians relied upon by Pleasant Hills were Caldwell's primary physicians.

¶6. The trial judge held a hearing on Pleasant Hills' motion to compel, and the parties argued their positions about whether Caldwell's primary physician had determined that he lacked capacity.[2] Referring to the medical records attached to its motion to compel, Pleasant Hills argued that Caldwell's "primary physicians had indicated that he did not have the legal

---

[2]Mississippi law allows for a "surrogate" to make healthcare decisions for a patient "*if the patient has been determined by the primary physician to lack capacity* and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211 (Rev. 2013) (emphasis added).

capacity to sign on his own behalf, and therefore the family members' signatures are – do make this arbitration agreement enforceable." Debra countered that Pleasant Hills merely was relying on "a couple of doctors' visits where [Caldwell] seemed to be disoriented," and that "no diagnosis [was] made."

¶7. Following the hearing, Pleasant Hills moved for permission to conduct limited discovery, stating that "[t]he Court recently requested a supplementation of the record with medical records showing that the decedent lacked capacity on the day of admission such that a family member would have had authority pursuant to Miss. Code Section 41-41-215 to admit/bind him." Pleasant Hills requested permission to obtain the medical charts needed in order to respond to the trial court's request, and the trial judge granted the motion.

¶8. Pleasant Hills then filed a "supplement" in support of its motion to dismiss and compel arbitration. Pleasant Hills attached four additional pages of medical records, which consisted of consultation notes from a speech therapist and a discharge summary. Pleasant Hills argued that these additional medical records "clearly" revealed that Caldwell "had in fact suffered a stroke (cerebrovascular accident) which caused a significant mental status change and also prevented him from being able to communicate his health care needs or make health care decisions." As such, Pleasant Hills argued, Caldwell "'lacked capacity,'" and Debra was his "'Surrogate'" pursuant to Section 41-41-211 and "had the authority and capacity to bind [Caldwell] to the Arbitration Agreement at issue.

¶9. The trial judge granted Pleasant Hills' motion to compel about three weeks after its supplementation. The entirety of the trial judge's analysis states that:

4

The Court heard oral argument November 26, 2013, regarding Defendants' motion to compel arbitration. The Court stated its concerns regarding whether or not Mr. Tarvin lacked mental capacity such that Ms. Debra Tarvin had authority to act as a surrogate under Miss. Code Section 41-41-201. The Court ordered additional discovery regarding this issue. The parties recently completed discovery and have asked for a ruling.

The August 24, 2007, discharge summary prepared by Dr. Thomas, notes Mr. Tarvin suffered from a recent "cerebrovascular accident," that he had "acute mental status changes" and dementia. It also notes it was his family's desire that he be discharged to the nursing home; the arbitration agreement was signed approximately three days later.

Debra filed a motion for reconsideration, which the trial judge denied after a hearing. Debra now appeals to this Court and argues simply that "no valid arbitration agreement exists."

## ANALYSIS

¶10. This Court reviews the grant or denial of a motion to compel arbitration *de novo*. *Tupelo Auto Sales, Ltd. v. Scott*, 844 So. 2d 1167, 1169 (Miss. 2003). This Court has "'endorsed the undisputed province of the Federal Arbitration Act [(FAA)]'" and has recognized its "'clear authority to govern agreements formed in interstate commerce'" where a contractual provision provides for arbitration. *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010) (citations omitted). Also, this Court previously has ruled that the FAA is applicable to nursing-home admissions agreements that contain arbitration clauses. *Id.*

¶11. Under the FAA, courts employ a two-pronged inquiry when reviewing an arbitration agreement. *Id.* At issue here is the first prong, which has two considerations: "'(1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement.'" *Id.* This Court applies the law of contracts to determine if a

valid arbitration agreement exists. *Id.* "The elements of a contract are '(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" *Id.* (citation omitted) (emphasis added).

¶12. Debra contends that Pleasant Hills' "entire argument, and the trial court's decision to grant the Motion to Compel Arbitration, rests on the proposition that the Mississippi Uniform Healthcare Surrogate Act applies." Similarly, Pleasant Hills asserts that "[t]he only issue before this Court is whether Cassandra Thomas, M.D. qualifies as Mr. Tarvin's primary physician under the Uniform Healthcare Decisions Act . . . and if so, whether Dr. Thomas determined that Mr. Tarvin 'lacked capacity' as defined by the Act." So even though the parties presented several other arguments to the trial judge, they agree that the only issue on appeal is whether Caldwell's primary physician had determined that he lacked capacity, such that Debra was qualified statutorily to act as his "surrogate" and to bind him to the arbitration agreement.

¶13. The relevant statutes are codified as the "Uniform Health-Care Decisions Act," Mississippi Code Section 41-41-201 to 41-41-229 (the "Act"). Section 41-41-211 states that "[a] surrogate may make a health-care decision for a patient who is an adult or emancipated minor *if the patient has been determined by the primary physician to lack capacity* and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(1) (Rev. 2013) (emphasis added). Section 41-41-211

6

specifically designates an adult child as a person who may act as a surrogate. Miss. Code Ann. § 41-41-211(2) (Rev. 2013).

¶14. Importantly, an individual is "*presumed* to have capacity to make a health-care decision, to give or revoke an advance health-care directive, and to designate or disqualify a surrogate." Miss. Code Ann. § 41-41-223 (Rev. 2013) (emphasis added). The Act defines "capacity" as "an individual's ability to understand the significant benefits, risks, and alternatives to proposed health care and to make and communicate a health-care decision." Miss. Code Ann. § 41-41-203(d) (Rev. 2013). And "primary physician" is defined as "a physician designated by an individual or the individual's agent, guardian, or surrogate, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility." Miss. Code Ann. § 41-41-203(o) (Rev. 2013).

¶15. Recently, in ***Hattiesburg Health & Rehab Center, LLC v. Brown***, 176 So. 3d 17 (Miss. 2015), this Court said that it has "returned to a strict interpretation" of the Act:

> Our Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted: by a primary physician determining lack of capacity. Miss. Code Ann. § 41–41–211(1) (Rev. 2009) . . . . This Court must follow the plain and unequivocal language of the statute and require that, in order for one to act as a health-care surrogate, there must first be a determination of a lack of capacity by a patient's primary physician.

*Id.* at 23.

¶16. Debra argues that the "record is bereft of any evidence that Mr. Tarvin's 'primary physician' has made any finding herein." Specifically, she argues that "[t]here is nothing in

7

the record to indicate that Mr. Tarvin had 'designated' Dr. Cassandra Thomas 'to have primary responsibility' for his healthcare," nor is there "evidence that an 'agent, guardian, or surrogate' had designated any of Mr. Tarvin's healthcare providers as a 'primary physician,' other than 'Robert Smith.'" We agree.

¶17. As detailed above, "primary physician" means a

> physician designated by an individual or the individual's agent, guardian, or surrogate, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility.

Miss. Code Ann. § 41-41-203(o) (Rev. 2013). Debra is correct that there is no evidence in the record that Caldwell had "designated" Dr. Thomas as his primary physician, and she also is correct that there is no evidence that she or any other "agent, guardian, or surrogate" had designated Dr. Thomas as Caldwell's primary physician. On the contrary, when asked to designate the "attending physician of your choice" in the Admission Agreement, Debra named Dr. Robert Smith.

¶18. Pleasant Hills does not point to any "designation" in the record but instead argues that Dr. Thomas was Caldwell's "primary physician" because she "undertook that responsibility" under the Act. But we find that the record does not support that argument. At most, the record supports that Dr. Thomas saw Caldwell—an older gentleman in his mid-seventies—at her office in January 2005, and that she was the attending physician for Caldwell's hospital stay in August 2007, just before his admission to Pleasant Hills. The fact that a physician has seen a patient twice in nearly three years is not proof that the physician has "undertaken primary responsibility" for that patient's health care, especially when family members

8

designated another physician as the "attending physician" in an Admissions Agreement just three days later.

¶19. Additionally, we note that the trial judge did not appear to make a finding that Dr. Thomas was Caldwell's primary physician. Indeed, his order granting Pleasant Hills' motion to compel made no findings regarding Caldwell's primary physician, nor is the phrase "primary physician" even used. And at the hearing on Debra's motion to reconsider, the trial judge said: "I just feel though that Dr. Thomas, *primary physician, attending physician, whatever, you know*, he [sic] was the physician that made this diagnosis and made the admission to the hospital. Now, I feel as though *that probably puts him [sic] in the category there of primary physician . . . .*" (Emphasis added.)

¶20. Again, we review de novo the trial judge's decision to grant a motion to compel, and we strictly interpret the requirements of the Act. With those principles in mind, we find that Pleasant Hills has not shown that Dr. Thomas was Caldwell's primary physician. As such, we find it unnecessary to address whether Dr. Thomas determined that Caldwell lacked capacity.

**CONCLUSION**

¶21. The Act requires determination by a primary physician that an individual lacks capacity before a "surrogate" properly can make a healthcare decision for that individual. We find that the record here does not support a finding that Dr. Thomas was Caldwell's primary physician. We therefore reverse the trial court's order compelling arbitration and remand the case for further proceedings consistent with this opinion.

9

¶22.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**