# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01190-COA

**THE ESTATE OF JACK HOWARD BANKSTON, DECEASED: VICTORIA BANKSTON**     **APPELLANT**

**v.**

**CLC OF BILOXI, LLC D/B/A BILOXI COMMUNITY LIVING CENTER**     **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/26/2016 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | WILLIAM HARVEY BARTON DANIELLE BREWER JONES |
| ATTORNEYS FOR APPELLEE: | JOHN G. WHEELER MARGARET SAMS GRATZ |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 09/12/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LEE, C.J., FOR THE COURT**:

¶1.     Victoria Bankston, on behalf of the estate of Jack Howard Bankston, appeals the circuit court's grant of Biloxi Community Living Center's (CLC) motion to compel arbitration. Finding error, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

¶2.     On December 21, 2012, Jack fell at his home, hitting his head and fracturing his cervical spine. He was taken to the University of Mississippi Medical Center where he underwent spinal surgery and was admitted to the ICU. While in the ICU, he suffered

respiratory distress, which required an emergency bedside tracheostomy. On January 5, 2013, Jack was transferred to a long-term acute-care center, Regency, at Forrest General Hospital. Ralph C. Kahler, M.D., was his primary physician while at Forrest General from January 5, 2013, to January 30, 2013, when Jack was discharged. Dr. Kahler's discharge note indicated that Jack's diagnoses included a "closed head injury with encephalopathy related thereto" and "acute delirium secondary to [the closed head injury]."

¶3. On January 30, 2013, the same date as his hospital discharge, Jack was admitted to CLC. The nurse's admission notes indicate that he still had a tracheostomy, which interfered with his ability to speak. Around 3 p.m. that same day, Jack climbed out of his nursing-home bed by crawling over the rails on the left side. He was placed back in the bed. Only a few minutes later, Jack attempted to get out of his bed by crawling over the rails on the right side. He was again placed back in the bed. Around 8:30 p.m., Jack was found lying on the floor on his back. He was taken to the emergency room at Biloxi Regional Medical Center, where he died the following day—January 31, 2013.

¶4. On August 11, 2014, Jack's wife, Victoria, as a representative of his estate, filed a wrongful-death complaint alleging negligence against CLC. CLC responded with a motion to dismiss and compel arbitration. Jack did not sign the nursing-home admission agreement, but Victoria had signed the admission agreement with CLC on Jack's behalf as a "family member." The admission agreement contained an arbitration clause. The circuit court held a hearing on the motion, as well as ordered supplemental briefing on the issue of whether Jack lacked capacity as defined under the controlling statute, Mississippi Code Annotated

2

section 41-41-203(d) (Rev. 2013). The circuit court held the following:

> Upon review, the evidence, including Dr. Kahler's diagnoses, indicates that prior to his admission to CLC, [Jack] lacked capacity as he was unable to understand and to make and communicate his health-care needs and decisions. As a result, [Victoria] had the authority to act as his surrogate under [Mississippi Code Annotated section 41-41-211(1) (Rev. 2013)]. Accordingly, [Jack] is bound by the admission agreement and the arbitration provision therein.

¶5. Victoria filed a motion to reconsider, and later submitted an affidavit from Dr. Kahler in support of the motion. However, the circuit court denied Victoria's motion. Victoria now appeals, asserting that the circuit erred in: (1) finding that Victoria was a proper healthcare surrogate, (2) finding that the admission agreement was properly executed by Victoria, and (3) not reversing its decision under the motion to reconsider, in light of the filing of Dr. Kahler's affidavit. Finding the healthcare-surrogacy issue dispositive of this appeal, we decline to address Victoria's remaining issues.

## STANDARD OF REVIEW

¶6. This Court reviews the grant or denial of a motion to compel arbitration under a de novo standard. *Harrison Cty. Commercial Lot LLC v. H. Gordon Myrick Inc.*, 107 So. 3d 943, 949 (¶12) (Miss. 2013). In reviewing whether the motion to compel arbitration should have been granted or denied, we do not review or consider the merits of the underlying claim. *Id*. at (¶13).

¶7. The Mississippi Supreme Court has recognized the Federal Arbitration Act (FAA) as having "the authority to govern agreements formed in interstate commerce where a contractual provision provides for arbitration." *Hattiesburg Health & Rehab Ctr. LLC v.*

*Brown*, 176 So. 3d 17, 20 (¶8) (Miss. 2015) (internal quotation marks and citation omitted).

Additionally, the supreme court has ruled that the "FAA is applicable to nursing-home admission agreements that contain arbitration clauses." *Id.* Under the FAA, this Court must first determine whether a valid arbitration agreement exists. *Id.* at (¶9).

> This Court applies the law of contracts to determine if a valid arbitration agreement exists. The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation.

*Id.* (internal quotation marks and citation omitted).

### DISCUSSION

¶8.     Victoria argues that the arbitration agreement was not valid, and thus the trial court erred in granting CLC's motion to compel arbitration. Specifically, Victoria argues that she did not possess the authority as Jack's healthcare surrogate—as the trial court determined—to execute the admission and arbitration agreement on Jack's behalf. We agree.

¶9.     In *Hattiesburg Health* (*HHRC*), the supreme court explained the proper designation of a healthcare surrogate:

> Under the healthcare surrogate statutes, a third party may make healthcare decisions for another, but only if certain prerequisites are met: A surrogate may make a health-care decision for a patient who is an adult or emancipated minor *if the patient has been determined by the primary physician to lack capacity* and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

*HHRC,* 176 So. 3d at 22 (¶17) (citing § 41-41-211(1)).

¶10.    In the instant case, Victoria argues that the circuit court improperly found that Jack had been determined by the primary physician to lack capacity. She contends that no such

4

determination was made at all. CLC argues that Dr. Kahler's discharge-summary note, charted the same day Jack was admitted to CLC, and which specified that Jack's diagnoses consisted of a "closed head injury with encephalopathy related thereto" and "acute delirium secondary to [the closed head injury]," constituted a determination of lack of capacity. CLC also points to the nurse's admission notes from the day Jack was admitted to CLC, which stated that the "patient does not speak and is confused in nature" and that he "did not acknowledge understanding." CLC argues that these medical records showed that Jack was incapacitated. The supreme court has, however, stressed a "strict interpretation of the surrogate statutes" and, in doing so, has rejected similar medical-record arguments. *Id.* at 23 (¶22).

¶11. With similar facts to the instant case, in *HHRC*, "[a] nursing home resident's wife signed an admission agreement that contained an arbitration provision." *Id*. at 18 (¶1). "Her husband died soon after his discharge, and she brought a wrongful-death suit against the nursing home, Hattiesburg Health & Rehab Center, LLC (HHRC)." *Id*. "HHRC moved to stay the proceedings and to compel arbitration." *Id*. The trial court denied HHRC's motion, and on appeal, the supreme court affirmed. *Id*. One of HHRC's arguments was that the decedent's wife had executed the admission and arbitration agreement on behalf of her husband as his healthcare surrogate. *Id*. at 22 (¶17).

¶12. The supreme court noted that the parties had attached medical records, which they alleged showed that the decedent was incapacitated based on his medical diagnoses. *Id.* at (¶19). But the supreme court rejected the notion that the attaching of medical records was

sufficient as a determination of lack of capacity:

> [T]here is simply no evidence in the record that [the decedent's] primary physician ever made any capacity determination. It is true that [the decedent's wife] attached some medical records to her response to the motion to compel, but we found nowhere in the record . . . any indication that [the decedent's primary physician] had determined that [the decedent] lacked capacity.

*Id.*

¶13. Similarly, here, CLC relies on Jack's medical records as sufficient for the prerequisite that the primary physician had made a determination that he lacked capacity. But, like *HHRC*, nowhere in the record is there an indication that Jack had been determined by Dr. Kahler to lack capacity. Medical records indicating Jack's diagnoses and symptomatology are not the equivalent of an affirmative determination by a physician that the patient lacks capacity as defined by the statute. Additionally, the nurse's admission note stating that Jack exhibited confusion and did not indicate understanding, which CLC argues supports the finding that Jack lacked capacity, is of no bearing. The supreme court in *HHRC* makes it clear that a nonphysician's "opinion is irrelevant to this inquiry under Section 41-41-211." *Id*. at 23 (¶22). Furthermore, Dr. Kahler later executed an affidavit stating that he was Jack's primary physician and that "[d]ue to the lack of medical evidence, [could not] form a medical opinion one way or the other as to whether [Jack] needed a health care surrogate at the time of his discharge on January 30, 2013."

¶14. A determination that an individual lacks capacity to make healthcare decisions is not one for a court to make after reviewing a patient's medical records. "Our Legislature has very specifically provided the manner in which the presumption that an individual has

capacity to make a health-care decision may be rebutted: by a primary physician determining lack of capacity." *Id.* (quoting *Adams Cmty. Care Ctr. v. Reed*, 37 So. 3d 1155, 1159 (¶10) (Miss. 2010) (citing § 41-41-211(1))). Here, the circuit court stated that "[u]pon review, . . . the evidence, including Dr. Kahler's diagnoses, indicates that prior to his admission to CLC, [Jack] lacked capacity. . . ." However, the standard is not whether the court, in its opinion, finds that the evidence indicates that the patient lacked capacity. The standard is whether *the primary physician has made the determination* that a patient lacked capacity. Here, there is no evidence in the record *that Dr. Kahler made the determination* that Jack lacked "capacity" as that term is defined under section 41-41-203(d).

¶15. The dissent argues that the trial court should be affirmed because "the discharge summary note indicated that Jack lacked capacity . . ." and because the "trial court also opined that Dr. Kahler's notes in Jack's medical records indicated that Jack lacked capacity." However, the dissent's rationale is not in accord with our law as set forth by the Legislature. It is not for the trial court, or this Court, to determine whether Jack lacked capacity or to attempt to interpret whether medical records indicated a lack of capacity. It matters not that Jack's medical records indicated he had suffered a closed head injury and exhibited acute delirium, or what symptoms nonphysician medical personnel charted. It matters not that this Court or other reasonable minds may conclude that Jack lacked capacity. Furthermore, in the instant case, it matters not whether Jack actually lacked capacity. What matters—and what section 41-41-211 requires—is whether *a physician* has made an affirmative finding that a patient lacks capacity. The dissent seeks to assert its own judgment where the

7

Legislature has explicitly required the judgment of a physician.

¶16. "This Court must follow the plain and unequivocal language of the statute and require that, in order for one to act as a health-care surrogate, there must first be a determination of a lack of capacity by a patient's primary physician." *HHRC*, 176 So. 3d at 23 (¶22) (quoting *Adams Cmty Care*, 37 So. 3d at 1159 (¶11)). Because there is no evidence that Dr. Kahler determined that Jack lacked capacity, Victoria lacked the authority to act as his healthcare surrogate and thus bind him to arbitration. Again, as this issue is dispositive, we decline to address Victoria's remaining issues. Accordingly, we hold that the trial court erred in granting CLC's motion to compel.

¶17. **REVERSED AND REMANDED.**

**IRVING, P.J., ISHEE, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J. BARNES, J., NOT PARTICIPATING.**

**CARLTON, J., DISSENTING:**

¶18. I respectfully dissent. I would affirm the trial court's finding that Dr. Kahler's discharge-summary note indicated that Jack lacked capacity as defined by the Uniform Health-Care Decisions Act (the Act). *See* Miss. Code Ann. § 41-41-211(1) (Rev. 2013).[1]

---

[1] Section 41-41-211 provides:

(1) A surrogate may make a health-care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

(2) An adult or emancipated minor may designate any individual to act as surrogate by personally informing the supervising health-care provider. In the absence of a designation, or if the designee is not reasonably available, any

As a result of this finding, the trial court correctly found that Victoria, as Jack's spouse, was therefore authorized under the Act to enter into CLC's admission and arbitration agreement on behalf of Jack, thus binding Jack to the agreement. *See* Miss. Code Ann. § 41-41-211(2)(a).

¶19. The record reflects that on January 30, 2013, Dr. Kahler entered a discharge summary for Jack upon his discharge from Forrest General Hospital and subsequent transfer to CLC. The trial court observed that in the discharge summary, Dr. Kahler, as Jack's primary-care physician, diagnosed Jack with a "closed head injury with encephalopathy" and "acute delirium secondary" to his closed head injury.[2] The discharge summary also reflected that at the time of his transfer, Jack had a tracheostomy and was unable to speak. Jack's patient-care report provided by American Medical Response, the company transporting Jack from Forrest General to CLC, further documented that Jack did not speak and was "confused in nature." Additionally, patient notes provided by a nurse on January 30, 2013, reflected that

member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate:

    (a) The spouse, unless legally separated;

    (b) An adult child;

    (c) A parent; or

    (d) An adult brother or sister.

[2] *See Covenant Health & Rehab. of Picayune L.P. v. Brown*, 949 So. 2d 732, 736-37 (¶¶10-11) (Miss. 2007) (overruled on other grounds) (admitting physician at hospital found that Brown lacked mental capacity to manage her affairs prior to signing of hospital's admission agreement).

Jack "did not acknowledge understanding."

¶20.     Based on the evidence presented, the trial court opined that Dr. Kahler constituted Jack's primary-care physician as defined by Mississippi Code Annotated section 41-41-203(o) (Rev. 2013).   Medical records presented at trial, showing that Dr. Kahler was responsible for and assumed primary care of Jack while at Forrest General Hospital, support this finding.  The trial court also opined that Dr. Kahler's notes in Jack's medical records indicated that Jack lacked capacity as defined by statute.

¶21.     After reviewing the record, I find that the evidence presented at trial clearly supports the trial court's finding that Victoria possessed authority as Jack's surrogate under the Act to bind him to the admission and arbitration agreement.  *See Brown*, 949 So. 2d at 736-37 (¶¶10-11) (overruled on other grounds) (discussing a surrogate's authority to bind a patient to an arbitration agreement contained in a nursing-home admission agreement pursuant to section 41-41-211).  Based upon the foregoing, I submit that the trial court properly granted CLC's motion to dismiss and compel arbitration.

     **GRIFFIS, P.J., JOINS THIS OPINION.**