# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00355-COA

**ESTATE OF LEROY HUMPHREY BY AND THROUGH BOBBY HUMPHREY, ADMINISTRATOR**                                        APPELLANT

v.

**TUNICA COUNTY HEALTH & REHAB LLC**                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/2020 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WALTER ALAN DAVIS |
| | REID KENDALL POSEY |
| | STEVEN W. PITTMAN |
| ATTORNEY FOR APPELLEE: | JOSEPH SPENCER YOUNG JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/05/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     This case concerns a party's capacity to act as a health-care surrogate under the Mississippi Uniform Health-Care Decisions Act (the Health-Care Decisions Act), Mississippi Code Annotated sections 41-41-201 through -229 (Rev. 2018). Alta Humphrey, on behalf of his father Leroy Humphrey, signed a nursing home "Admission Agreement" that contained an arbitration provision. After Leroy died, Bobby Humphrey, as the administrator of Leroy's estate (the Estate), sued the nursing home, Tunica County Health & Rehab LLC (Tunica County Rehab), alleging negligence, gross negligence, and negligence/premises liability for

injuries Leroy suffered when he was assaulted by another nursing-home resident. Tunica County Rehab moved to compel arbitration. The trial court granted Tunica County Rehab's motion.

¶2.     The Estate appeals, asserting that the trial court committed reversible error when it determined that Dr. Richard Waller was Leroy's "primary physician" when he determined that Leroy lacked capacity, such that Alta was qualified to act as Leroy's health-care surrogate under section 41-41-211(1) of the Health-Care Decisions Act and to bind Leroy to the arbitration provision in Tunica County Rehab's admission agreement. For the reasons addressed below, we find that Tunica County Rehab has shown that Dr. Waller was Leroy's "primary physician" under the Health-Care Decisions Act when he determined Leroy's mental incapacitation and that Leroy's son Alta was therefore statutorily qualified to act as Leroy's surrogate and to bind him to arbitration. Accordingly, we affirm the trial court's order compelling arbitration in this matter.

## FACTS AND PROCEDURAL HISTORY

¶3.     Tunica County Rehab is a nursing-home facility located in Tunica County, Mississippi. Dr. Waller is both an owner of the facility and its medical director. On May 23, 2012, Alta Humphrey signed an admission agreement with Tunica County Rehab to admit his father Leroy Humphrey as a resident in that facility. Among other terms and conditions, the agreement contains an arbitration provision.

¶4.     The first page of the agreement lists "Leroy Humphrey" as the "Resident" and assigns

2

Leroy a resident number; Alta is identified as Leroy's "Son" and is identified as the "Responsible Party." There is no evidence in the record that Alta held power of attorney over his father or that any court had appointed Alta as guardian or conservator of his father. Below Alta's signature on the admission agreement is the statement: "Signature of the Responsible Party in His/Her Individual Capacity and on Behalf of the Resident in the Following Capacity . . . Authorized Agent and/or Health Care Surrogate."

¶5.     Section E of the admission agreement sets forth the arbitration provision. It provides, in part, as follows:

> It is understood and agreed by the Facility and Resident and/or Responsible Party that any legal dispute, controversy, demand or claim (hereinafter collectively referred to as "claim" or "claims") that arises out of or relates to the Admission Agreement or any service or healthcare provided by the Facility to the Resident, shall be resolved exclusively by binding arbitration pursuant to the Federal Arbitration Act.
>
> . . . .
>
> This agreement to arbitrate includes, but is not limited to, any claim for . . . violations of any rights granted to the Resident by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice or any other claim based on any departure from accepted standards of medical or healthcare or safety whether sounding in tort or in contract.
>
> . . . .
>
> It is the intention of the parties to this arbitration agreement that it shall inure to the benefit of and bind the parties, their successors and assigns, including . . . all persons whose claim is derived through or on behalf of the Resident, including that of any parent, spouse, child, guardian, conservator, executor, administrator, legal representative, wrongful death heir, or heir of the Resident.

3

The admission agreement also provides, in all capital letters, that

> THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTANDS THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION, AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.

¶6. On the same day that Alta signed the admission agreement, May 23, 2012, Dr. Waller completed and signed a statement that reads in relevant part, "Leroy Humphrey is unable to sign Nursing Home admission papers due to dementia and confusion . . . [d]oesn't understand what he is signing." "Physician" is printed under Dr. Waller's signature. The record also contains other records and admission forms dated May 23, 2012, describing Dr. Waller as Leroy's "physician" or "attending physician." A patient information "Face Sheet" with a March 10, 2016 print date identifies Dr. Waller as Leroy's "primary physician." Dr. Waller had not provided any care or treatment to Leroy before his May 23, 2012 admission date.

¶7. In February 2016, while Leroy was a Tunica County Rehab resident, Leroy was assaulted by his roommate, who beat him with the metal foot plate of a wheelchair. About two years later on April 25, 2018, Bobby Humphrey, as the administrator of Leroy's estate, sued Tunica County Rehab for negligence, gross negligence, and negligence/premises liability.

¶8. Tunica County Rehab moved to compel arbitration on May 29, 2018, in accordance with the arbitration provision in the admission agreement. The Estate opposed arbitration, asserting that Alta did not qualify as a health-care surrogate under the Health-Care Decisions

4

Act and thus was not authorized to sign the admission agreement on Leroy's behalf and bind him to arbitration. Specifically, the Estate asserted that section 41-41-211(1) of the Health-Care Decisions Act requires a patient's "primary physician" to determine a potential resident's lack of mental competency for the statute to apply, and Dr. Waller was not Leroy's "primary physician" as that term is defined under section 41-41-203(o).

¶9. The trial court conducted a hearing on the matter and thereafter issued its order compelling arbitration, finding as follows:

> Mississippi law does not require a party to prove the designation of primary through medical records. The designation alone is enough. Here, there is no need for the Court to undertake such extensive review of Dr. Waller's treatment of Leroy Humphrey. [Dr.] Waller is designated as primary in the record.

> Accordingly, the requirements of [section] 41-41-211 are satisfied; therefore, this Court finds Alta Humphrey to be a health-care surrogate of his father Leroy Humphrey. As such, Alta Humphrey possesses the requisite authority to execute . . . the Admission Agreement which contains a binding arbitration provision.

> The Court, having considered the pleadings and arguments of counsel, finds that [Tunica County Rehab's] Motion to Compel Arbitration is well taken and should be granted.

¶10. The Estate appeals.

## STANDARD OF REVIEW

¶11. "In reviewing an appeal of an order compelling arbitration, we review the trial judge's factual findings under an abuse-of-discretion standard, and we conduct a de novo review of all legal conclusions." *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶11) (Miss.

5

2020) (quoting *Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 605-06 (¶8) (Miss. 2014)). The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 through 16, applies "to nursing-home admissions agreements that contain an arbitration clause." *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1158 (¶6) (Miss. 2010).

## DISCUSSION

### Whether Alta was authorized to bind Leroy to arbitration as his health-care surrogate pursuant to Mississippi Code Annotated section 41-41-211(1).

¶12. The Estate asserts that the trial court's order compelling arbitration should be reversed because Alta did not qualify as Leroy's health-care surrogate under section 41-41-211(1) of the Health-Care Decisions Act when he signed the Tunica County Rehab admission agreement. Specifically, the Estate contends that when Dr. Waller determined that Leroy lacked capacity to sign the admission agreement, Dr. Waller was not Leroy's "primary physician," as required under section 41-41-211(1) in order for Alta to act as Leroy's health-care surrogate. *See also* § 41-41-203(o) (defining "primary physician"). Because he was not a statutorily qualified health-care surrogate, the Estate asserts, Alta was without authority to bind Leroy to arbitration under the admission agreement. We disagree for the reasons discussed below.

¶13. When determining whether a party is bound to arbitration, courts generally "conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the

6

arbitration agreement." *E. Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶9) (Miss. 2002).[1]  At

issue in this case is the first consideration (the existence of a valid agreement to arbitrate),

which requires that we determine whether Alta had authority to execute the admission

agreement as Leroy's health-care surrogate.[2]

¶14.    The law of contracts applies in determining whether a valid arbitration agreement

exists.  *Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 637 (¶11) (Miss. 2016).  The six

elements of a valid contract are: "(1) two or more contracting parties, (2) consideration, (3)

an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*,

(5) mutual assent, and (6) no legal prohibition precluding contract formation." *Id.* (emphasis

added) (quoting *Reed*, 37 So. 3d at 1158 (¶7)).  Tunica County Rehab, as the party seeking

to enforce the arbitration provision in the admission agreement, bears the burden of

---

[1] The second prong, which is not at issue here, is "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Taylor*, 826 So. 2d at 713 (¶10) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 626 (1985)).

[2] The record reflects that the Estate did not raise the "scope" issue in the trial court, and, as the Estate explained in its reply brief, it does not raise any such issue on appeal:

> Although not raised as issues for appeal in the Appellant's initial brief, the Appellee discusses at great length the enforceability, *scope*, and conscionability of the arbitration agreement in general.  However, Appellant is not disputing the general enforceability or conscionability of arbitration agreements contained within nursing home admission agreements.  Appellant is simply asserting that in this particular case, the statutory requirements for Alta Humphrey's role as health-care surrogate were not met, and therefore, he could not and did not bind the Appellant to this arbitration agreement.

(Emphasis added).  In short, the "scope" issue is not before this Court.

7

establishing its validity. *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (¶14) (Miss. 2015) (citing *Trinity Mission Health & Rehab of Holly Springs LLC v. Lawrence*, 19 So. 3d 647, 651-52 (¶14) (Miss. 2009)).

### A.      Applicable Statutory Law

¶15.    In determining whether Alta was authorized to execute the admission agreement as Leroy's health-care surrogate, i.e., whether he had the "legal capacity to make a contract," *Tarvin*, 193 So. 3d at 637 (¶11), we examine the applicable statutes. Under section 41-41-211 of the Health-Care Decisions Act, "[a] surrogate[3] may make a health-care decision for a patient who is an adult or emancipated minor *if the patient has been determined by the primary physician to lack capacity*[4] and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(1) (emphasis added).

¶16.    Particularly relevant in this case, section 41-41-203(o) defines a "primary physician" as "a physician *designated by an individual or the individual's agent, guardian, or surrogate*, to have primary responsibility for the individual's health care *or*, in the absence of a

---

[3] If a patient has not designated a surrogate, as in this case, section 41-41-211(2) provides that "any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate: . . . The spouse, unless legally separated; . . . An adult child . . . ." Miss. Code Ann. § 41-41-211(2)(a)-(b). The record reflects that Leroy's spouse predeceased him, and the Estate does not dispute that Alta, as Leroy's son, is a member of a class who may serve as a health-care surrogate.

[4] Capacity is defined under the Health-Care Decisions Act as "an individual's ability to understand the significant benefits, risks, and alternatives to proposed health care and to make and communicate a health-care decision." Miss. Code Ann. § 41-41-203(d).

designation or if the designated physician is not reasonably available, *a physician who undertakes the responsibility*." Miss. Code Ann. § 41-41-203(o) (emphasis added). In applying these statutes, we must employ a "strict interpretation" and "follow the plain and unequivocal language of [section 41-41-211(1)] and require that, in order for one to act as a health-care surrogate, there must first be a determination of a lack of capacity by a patient's primary physician." *Tarvin*, 193 So. 3d at 637-38 (¶15) (quoting *Hattiesburg Health & Rehab Center LLC v. Brown*, 176 So. 3d 17, 23 (¶22) (Miss. 2015)); *see Reed*, 37 So. 3d at 1159 (¶¶10-11).

¶17. In short, a physician may qualify as a "primary physician" under the Health-Care Decisions Act in two ways: Either by (1) "an individual or the individual's agent, guardian, or surrogate" designating the physician "to have primary responsibility for the individual's health care"; *or* (2) "in the absence of a designation," by "a physician . . . undertak[ing] the responsibility" for the individual's primary health care. Miss. Code Ann. § 41-41-203(o).

¶18. The Estate contends that Tunica County Rehab failed to offer sufficient proof that Dr. Waller was Leroy's "primary physician" under either test. Tunica County Rehab, on the other hand, asserts that the following documents contained in the record sufficiently prove that Dr. Waller was Leroy's "primary physician" under both tests:

> (1) Patient information "Face Sheet" having a March 10, 2016 print date—the Face Sheet lists Dr. Waller as Leroy's "primary physician";
>
> (2) Admission Nursing Assessment-Leroy Humphrey (dated May 23, 2012)—"Waller" is written in the "Attending Physician" box;

9

(3) Nursing Questions for Nursing Assessment-Leroy Humphrey (dated May 23, 2012)—"Waller" is written above the "Physician" line;

(4) Medicaid Pre-Admission Screening (PAS)-Leroy Humphrey (dated May 23, 2012)—Dr. Waller signed this form certifying a primary diagnosis of Dementia;

(5) Fall Risk Evaluation-Leroy Humphrey (dated May 23, 2012)—"Waller" is written in the "Attending Physician" box;

(6) Physician's Order Sheet for Leroy Humphrey (dated May 23, 2012)—Handwritten notes provide: "Admit to [Nursing Home]—Dr. Waller services";

(7) Interdisciplinary Progress Notes for Leroy Humphrey (dated May 23, 2012)—Handwritten notes provide that "[Leroy Humphrey's] physician [is] Dr. Waller"; and

(8) Nurse's Notes for Leroy Humphrey (dated May 23, 2012)—Handwritten note provides: "2:30 p.m., [Leroy Humphrey] admitted 120B per Dr. Waller. Family at side."

## B. A Physician "Designated" as the Individual's Primary Physician

¶19. Based upon the applicable caselaw and statutory provisions, we find that Tunica County Rehab did not offer sufficient proof that Dr. Waller was Leroy's "primary physician" under the first test set forth in section 41-41-203(o), which requires proof that Leroy or his "agent, guardian, or surrogate" "designated" Dr. Waller as his "primary physician." Regarding Leroy's patient face sheet having a March 10, 2016 print date, although this document identifies Dr. Waller as Leroy's "primary physician," we do not find that this is evidence that Dr. Waller had been "designated" as Leroy's primary physician on May 23, 2012—the date Leroy was admitted nearly four years earlier.

10

¶20. With respect to the other seven documents that Tunica County Rehab relies upon, none of these documents indicate that Leroy or his "agent, guardian, or surrogate" designated Dr. Waller as Leroy's primary physician. The documents are not signed or prepared by Leroy or any person on his behalf, nor do they specifically identify Dr. Waller as Leroy's "primary" physician. We recognize that these forms identify Dr. Waller as "Leroy's physician" or his "attending physician," but applying a "strict interpretation" of sections 41-41-203(o) and 41-41-211(1) as we must, *see Tarvin*, 193 So. 3d at 637 (¶15); *Brown*, 176 So. 3d at 23 (¶22), we find that this documentation does not prove that Dr. Waller was "designated" as Leroy's "primary physician" under section 41-41-203(o). *See Tarvin*, 193 So. 3d at 638 (¶17) (determining that the first test under section 41-41-203(o) had not been met where "there [was] no evidence in the record that [the patient] had 'designated' Dr. Thomas as his primary physician, and . . . no evidence that [the patient's daughter] or any other 'agent, guardian, or surrogate' had designated Dr. Thomas as [the patient's] primary physician").

### C. A Physician Who "Undertakes the Responsibility" for the Individual's Primary Health Care

¶21. In the absence of a valid designation, as here, we turn to the second "primary physician" test pursuant to section 41-41-203(o).[5] That is, we examine whether the

---

[5] Presiding Judge Wilson and Judge Westbrooks have both written dissents with respect to this issue. Where these dissents differ we will refer to them separately, otherwise we will refer to them collectively as "the dissents" or "the dissenting opinions."

documents Tunica County Rehab presented to the trial court in support of its motion to compel arbitration sufficiently prove that Dr. Waller was Leroy's "primary physician" because he had "undertak[en] the responsibility" of Leroy's health care at the time of Leroy's admission. For the reasons addressed below, we find that this documentation constitutes sufficient proof that Dr. Waller was Leroy's "primary physician" under section 41-41-203(o)'s second "primary physician" test.

¶22. The Estate asserts that Dr. Waller could not be Leroy's "primary physician" under this test because he had never treated or seen Leroy prior to Leroy's admission date. According to the Estate, as well as Judge Westbrooks in her dissent, a physician cannot be a patient's "primary physician" contemporaneously with that patient's admission.[6] In addressing this issue, we must review as a whole the applicable statutes within the Health-Care Decisions Act "to avoid adhering to one sentence or phrase of statute in a way that skews its true meaning." *Lawson v. Honeywell Int'l Inc.*, 75 So. 3d 1024, 1029 (¶15) (Miss. 2011). In doing so, we find that Judge Westbrooks's and the Estate's assertions on this point are unsupported by a reading of the applicable statutes as a whole and the plain meanings of

---

[6] Regarding the timing issue, Presiding Judge Wilson's dissent provides, "I agree with the plurality that the Act does not necessarily require a preexisting doctor patient relationship and that it is possible for a doctor to 'undertake' 'primary responsibility for the patient's health care' at the time the doctor makes the statutorily required determination that the patient lacks 'capacity.'" *Post* at ¶47. Presiding Judge Wilson adds, however, that "the problem in this case is not simply one of timing." *Id.* Rather, according to him, "the problem is that Tunica County Rehab failed to meet its burden of proof that Waller did in fact undertake primary responsibility for Leroy's health care at the time of Leroy's admission to the facility." *Id.* We address this issue below.

12

sections 41-41-203(o) and 41-41-211(1).

¶23.    As stated above, "[a] surrogate may make a health-care decision[7] for a patient . . . if the patient has been determined by the primary physician to lack capacity[.]"  Miss. Code Ann. § 41-41-211(1).  A "health-care decision" includes the "[s]election . . . of health-care . . . institutions[,]" Miss. Code Ann. § 41-41-203(h), such as Tunica County Rehab.[8]

¶24.    Most importantly, in defining a "primary physician," section 41-41-203(o) specifically provides for situations when there is no previously designated primary physician or when a designated primary physician is not "reasonably available."  *Id.*  That is the situation before

---

[7] In *Hinyub*, the supreme court recognized that in both *Covenant Health Rehab of Picayune v. Brown*, 949 So. 2d 732 (Miss. 2007), and *Vicksburg Partners L.P. v. Stephens*, 911 So. 2d 507 (Miss. 2005) (both overruled on other grounds by *Covenant Health & Rehab. of Picayune LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009)), the supreme court "found that execution of the arbitration provision as part of the admissions agreement was part of the 'health-care decision,' [where] the arbitration provision was an essential part of the consideration for the receipt of 'health care' in those instances." *Miss. Care Ctr. of Greenville LLC v. Hinyub*, 975 So. 2d 211, 218 (¶16) (Miss. 2008) (quoting Miss. Code Ann. § 41-41-203(h)).  The arbitration provisions in the Tunica County Rehab admission agreement are identical to those set forth in *Stephens*, 911 So. 2d at 510 (¶¶2-3), and clearly were an "essential part of the consideration" for Leroy's receipt of health care at Tunica County Rehab.  The parties in this case agreed to binding arbitration with respect to "any claim," including claims for "violations of any rights granted to the Resident by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice or any other claim based on any departure from accepted standards of medical or healthcare or safety whether sounding in tort or in contract."  The admission agreement also contains the explicit provision in all capital letters that the parties "ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTANDS THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION, . . . AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS."

[8] *See* Miss. Code Ann. § 41-41-203(i) (defining a "health-care institution" as "a[] . . . facility . . . licensed, certified, or otherwise authorized or permitted by law to provide health care in the ordinary course of business.").

us—the record contains no evidence that prior to his admission, Leroy or someone on his behalf designated a physician to act as Leroy's "primary physician." To address this situation, section 41-41-203(o) provides that "[i]n the absence of a designation," a "primary physician" is "a physician who *undertake*s the responsibility." *Id.* (emphasis added).

¶25. Reviewing these statutes as a whole, we find that the Legislature's use of the present tense "*undertakes* the responsibility" of a patient's care in defining the role of a "primary physician" plainly allows for the situation when a physician "undertakes" responsibility for a patient's care contemporaneously with the patient's admission, as in this case. *See* Miss. Code Ann. § 41-41-203(o). We find that any other interpretation would fail to address the very circumstances the second test under section 41-41-203(o) was written to avoid. We therefore reject Judge Westbrooks's contrary position that "[a] primary physician must become such **before** a capacity determination is made," *post* at ¶54 (emphasis in original), as both unworkable and not taking into account a reading of the applicable statutes as a whole.

¶26. We recognize that in *Dykes v. Cleveland Nursing & Rehabilitation Center*, No. 4:15-CV-00076-DMB-JMV, 2016 WL 6462086, at *4 (N.D. Miss. Oct. 31, 2016), for example, the federal District Court for the Northern District of Mississippi found that documents *dated weeks after a patient's admission* did not constitute sufficient proof of the resident's capacity determination or a physician's status as "primary" at the time of the patient's admission. *Id.* We find no caselaw or statutory support, however, for the Estate's and Judge Westbrooks's

14

position that Tunica County Rehab cannot rely on documents prepared, dated, or signed *contemporaneously* with Leroy's admission to show that Dr. Waller was a "primary physician" under the second test delineated in section 41-41-203(o). Indeed, as we explain above, we find such a position contrary to the plain meaning of the applicable statutes.

¶27. We also find relevant that the incapacity statement that Dr. Waller completed and signed on the day Leroy was admitted provides that "Leroy Humphrey *is* unable to sign Nursing Home admission papers due to dementia and confusion . . . [d]oesn't understand what he is signing." Although we acknowledge that the documents completed when Leroy was admitted are not time-stamped, we find that use of the phrase "*is* unable to sign Nursing Home admission papers" supports an interpretation that Dr. Waller made his incapacity determination *before* Alta signed the admission agreement, so as to confirm the necessity of a surrogate to execute the admission papers.

¶28. The Estate also asserts that even if contemporaneously prepared and signed documentation could amount to sufficient proof satisfying the second test under section 41-41-203(o), that is not the case here. According to the Estate and both dissents, the documents Tunica County Rehab relies upon do not prove that Dr. Waller undertook the responsibility of Leroy's primary care so as to qualify him as Leroy's "primary physician" under section 41-41-203(o)'s second test. We disagree for the reasons addressed below.

¶29. The Estate relies on *Tarvin* to support its contention, but we find *Tarvin* distinguishable and inapplicable here. To briefly summarize the pertinent facts in that case,

15

Caldwill Tarvin was admitted to Pleasant Hills nursing home, and his daughter, Debra, signed the admission agreement containing an arbitration provision. *Tarvin*, 193 So. 3d at 634 (¶1). After Caldwill was admitted to the hospital with "life-threatening bedsores" and later died, Debra, on behalf of Caldwell's wrongful-death beneficiaries, sued Pleasant Hills based upon Pleasant Hills's alleged abuse and neglect. *Id.* at 635 (¶3). Pleasant Hills moved to compel arbitration, and the trial court granted its motion. *Id.* at 636 (¶9).

¶30. On appeal, the parties agreed that the only issue before the supreme court was "whether Cassandra Thomas, M.D. qualifie[d] as [Caldwell's] primary physician under the Uniform Healthcare Decisions Act . . . and if so, whether Dr. Thomas determined that [Caldwell] lacked capacity as defined by the Act." *Id.* at 637 (¶12) (internal quotation marks omitted). Reversing the trial court's decision to compel arbitration, the supreme court first determined that Dr. Thomas did not meet the first qualifying test for a "primary physician" under section 41-41-203(o) because there was no evidence that she was "designated" as Caldwell's primary physician. *Id.* at 638 (¶17).

¶31. Pleasant Hills, however, contended that Dr. Thomas qualified as Caldwell's primary physician because she "undertook that responsibility," as contemplated under section 41-41-203(o). *Id.* at (¶18). Among other medical records, Pleasant Hills relied upon a discharge summary dated August 24, 2007 (three days before Caldwell was admitted to Pleasant Hills) prepared by Dr. Thomas in which she noted that Caldwell "had 'acute mental status changes' and dementia." *Id.* at 636 (¶9).

¶32. The supreme court rejected Pleasant Hills's contention, observing that "[a]t most, the record supports that Dr. Thomas saw Caldwell . . . at her office in January 2005, and that she was the attending physician for Caldwell's hospital stay in August 2007, just before his admission to Pleasant Hills." *Id.* at 638 (¶18)*.* Based upon these circumstances, the supreme court found that "[t]he fact that a physician has seen a patient twice in nearly three years is not proof that the physician has 'undertaken primary responsibility' for that patient's health care, especially when family members designated another physician as the "attending physician" in an Admissions Agreement just three days later." *Id.*[9]

¶33. The facts in *Tarvin* are wholly distinguishable from those in this case. First, Dr. Waller is the only physician involved in this case—in *Tarvin* the family members designated another physician as the "attending physician" in the nursing home admission agreement that was signed three days after Dr. Thomas's August 24, 2007 discharge summary. *Id.* at 636 (¶9).

¶34. Second, Dr. Waller completed and signed an incapacity statement for Leroy on May 23, 2012, the day Leroy was admitted. Unlike Pleasant Hills, Tunica County Rehab does not rely on a discharge summary indicating a lack of capacity that was prepared three days before the patient's admission to the nursing home by a physician other than the "attending physician" identified in the admission agreement. *Id.*

---

[9] Having reversed the trial court's ruling on this basis, the supreme court "[found] it unnecessary to address whether Dr. Thomas determined that Caldwell lacked capacity." *Tarvin*, 193 So. 3d at 638 (¶20).

17

¶35. Third, although the issue whether Dr. Waller properly determined that Leroy lacked "capacity" under section 41-41-203(d) is not before us,[10] we address this issue to the extent

---

[10] The Estate did not contest whether Dr. Waller properly determined that Leroy "lacked capacity" under the Health-Care Decisions Act in the trial court. Likewise, the Estate does not raise this issue on appeal in any way. The issue is not before this Court. *See* M.R.A.P. 28(a)(3) (requiring the appellant to "identify the issues presented for review"); M.R.A.P. 28(a)(7) (requiring the appellant to address all issues "presented . . . with citations to the authorities, statutes, and parts of the record relied on").

Nevertheless, Judge Westbrooks discusses this issue at length in her dissent. We disagree with her assertions as we explain below, but even if we did not, we will not find the trial judge "in error on a matter not presented to the trial court for a decision." *Purvis v. Barnes*, 791 So. 2d 199, 203 (¶8) (Miss. 2001).

To briefly address Judge Westbrooks's remarks on this issue, we do not agree with the conclusion that "the record lacks any evidence showing that Dr. Waller . . . properly determined that Leroy lacked 'capacity' as that term is defined under [s]ection 41-41-203(d)." *Post* at ¶57. The cases cited in that dissent to support this assertion do not appear to address the situation before us. Namely, in this case Dr. Waller completed and executed a statement describing Leroy's confusion and inability to understand *the paperwork before him relating to his admission into Tunica County Rehab*—the specific "health-care decision" at issue. We find no reference to any similar evidence in the cases cited in Judge Westbrooks's dissent, and thus we find these cases distinguishable and inapplicable to the circumstances before us. *See Reed*, 37 So. 3d at 1158-59 (¶¶8-11) (physician's certification insufficient when it simply noted patient was "confused" apparently without specifically relating this confusion to the admissions process); *Forest Hill Nursing Ctr. Inc. v. McFarlan*, 995 So. 2d 775, 780 (¶8) (Miss. Ct. App. 2008) (medical assessment form generally indicating patient "was moderately impaired, had problems with her memory, had *periods* of altered perception and was unable to maintain basic hygiene without assistance" held insufficient to demonstrate patient's lack of capacity at time of admission (emphasis added)); *Est. of Bankston v. CLC of Biloxi LLC*, 240 So. 3d 456, 459 (¶13) (Miss. Ct. App. 2017) (general medical records, alone, without an "affirmative determination" by the primary physician regarding the patient's capacity at the time of admission found insufficient). Dr. Waller did not rely on his diagnosis of dementia, alone, in making his determination regarding Leroy's incapacity, but tied Leroy's confusion directly to his ability to understand the health-care decision he was making, and thus we respectfully find that Judge Westbrooks's reliance on *Holmes v. O'Bryant*, 741 So. 2d 366, 374 (¶38) (Miss. Ct. App.

18

it is relevant in further distinguishing the *Tarvin* case. We find it relevant that Dr. Waller specifically determined that Leroy was unable "to make and communicate [the] health-care decision" at issue in this case—his admission into the nursing home. *See* Miss. Code Ann. § 41-41-203(d) (defining "capacity" as including "an individual's ability . . . to make and communicate a health-care decision"); *Id.* § 41-41-203(h) (defining a "health-care decision" as including the "[s]election . . . of [a] health-care . . . institution[]").

¶36.    In particular, Dr. Waller found that at the time of Leroy's admission, Leroy was "unable to sign Nursing Home admission papers due to dementia and confusion . . . [d]oesn't understand what he is signing." Thus, rather than relying on a discharge summary prepared three days before the patient's admission as in *Tarvin*, Tunica County Rehab offered explicit evidence that *at the time of Leroy's admission*, Dr. Waller made the requisite "affirmative determination" that Leroy did not have the capacity to understand or address the health-care decision before him—his admission into Tunica County Rehab. *See Est. of Bankston*, 240 So. 3d at 459 (¶13) (recognizing the need for "an *affirmative determination* by a physician that the patient lacks capacity as defined by the statute" and finding that general "[m]edical

---

1999), is also misplaced.

Judge Westbrooks also observes in her dissent that some of the medical records in this case indicate that Leroy was "alert" and "oriented." This is true, but there is no indication in the record that these comments relate to Leroy's *situational orientation*—i.e., Leroy's ability to understand the situation and the "health-care decision" before him. In any event, these observations were contained in nurses' notes or in forms completed by other non-physician screeners whose opinions would be "irrelevant to [an] inquiry [regarding capacity] under Section 41-41-211." *Reed*, 37 So. 3d at 1159 (¶10).

19

records indicating [the patient's] diagnoses and symptomatology" do not suffice (emphasis added)).

¶37.    Fourth, contrary to the assertions made by both dissents, we find that the seven documents contemporaneously prepared and signed when Leroy was admitted to Tunica County Rehab sufficiently show that Dr. Waller "under[took] the responsibility" for Leroy's primary health care as of May 23, 2012.  For example, the "Medicaid Pre-Admission Screening (PAS)" form is signed by Dr. Waller and contains his certification that Leroy had "dementia" and was "appropriate for Medicaid long term care services."  Dr. Waller is also identified as Leroy's "physician" or "attending physician" in the Admission Nursing Assessment, Fall Risk Evaluation, Nursing Questions for Nursing Assessment form, Fall Risk Evaluation, and Interdisciplinary Progress Notes.  Additionally, the Nurse's Notes for Leroy Humphrey show that Leroy was admitted to Tunica County Rehab "per Dr. Waller," and the Physician's Order Sheet provides, "Admit to [Nursing Home]—Dr. Waller services."

¶38.    Fifth, consistent with our finding that these contemporaneously prepared and signed documents show that Dr. Waller "under[took] the responsibility" for Leroy's primary health care as of May 23, 2012, we likewise find that Leroy's patient face sheet listing Dr. Waller as Leroy's "primary physician" shows that Dr. Waller continued to undertake Leroy's primary health care during his nursing home stay.[11]

---

[11] A "face sheet" is a "summary of important information about a patient. It includes patient identification, past medical history, medications, allergies, upcoming appointments, insurance status, or other pertinent information." *See Face sheet, Medical Dictionary by*

20

## CONCLUSION

¶39.    In sum, the Health-Care Decisions Act requires a determination by a "primary physician" that an individual "lack[s] capacity" before a "surrogate" is qualified to make a health-care decision for that individual. *See* Miss. Code Ann. § 41-41-211(1). We find that the record here contains sufficient evidence showing that Dr. Waller "under[took] the responsibility" for Leroy's primary health care contemporaneously with his admission such that the second qualifying test under section 41-41-203(o) has been met, and we respectfully disagree with the dissents' opinions to the contrary. Accordingly, we find that Dr. Waller was Leroy's "primary physician" and that Alta was statutorily qualified to serve as Leroy's health-care surrogate when he signed the admission agreement and thus bind Leroy to arbitration.[12] The trial court's order compelling arbitration in this matter is affirmed.

¶40.    Finding the healthcare-surrogacy issue dispositive and that the trial court did not err in compelling arbitration in this case, we decline to address the additional estoppel defenses Tunica County Rehab raises on appeal. Tunica County Rehab also devoted a section of its brief asserting that the arbitration provision in its admission agreement is "procedurally and

---

*Farlex*, https://medical-dictionary.thefreedictionary.com/face+sheet (last visited Oct. 5, 2021). The patient face sheet for Leroy that is contained in the record has a March 10, 2016 print date. We take judicial notice that this is not an indication of when the information that the face sheet contains was added or updated.

[12] Although the trial court based its decision to compel arbitration on reasons different from this Court's, "we may on appeal affirm the decision of the trial court where the right result is reached, even though we may disagree with the trial court's reasons for reaching that result." *Pass Termite & Pest Control Inc. v. Walker*, 904 So. 2d 1030, 1032 (¶6) (Miss. 2004).

21

substantively conscionable." We likewise do not address this issue because, as the Estate made clear in its reply brief, the Estate has not raised any such issues on appeal.[13] For the reasons set forth above, we affirm the trial court's order compelling arbitration.

¶41.　**AFFIRMED.**

　　　**BARNES, C.J., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J.; McDONALD AND LAWRENCE, JJ., JOIN IN PART. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.; LAWRENCE, J., JOINS IN PART.**

　　　**WILSON, P.J., DISSENTING:**

¶42.　I agree with the plurality that the trial court erred by finding that Waller qualified as Leroy's "primary physician" based on a "designation." As the plurality holds, there is no evidence that Leroy or Leroy's "agent, guardian, or surrogate" ever "designated" Waller as Leroy's "primary physician." Miss. Code Ann. § 41-41-203(o) (Rev. 2018).

¶43.　However, I dissent from the plurality's finding that Waller "under[took]" "primary responsible for [Leroy's] health care" at the time of Leroy's admission to the nursing home. The limited documentary evidence that Tunica County Rehab presented in support of its motion to compel arbitration was insufficient to carry its burden of proof on that issue. Therefore, I respectfully dissent.

---

[13] The Estate explained in its reply brief that it was "not disputing the general enforceability or conscionability of arbitration agreements contained within nursing home admission agreements."

22

¶44. "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *KPMG LLP v. Singing River Health Sys.*, 283 So. 3d 662, 674 (¶34) (Miss. 2018) (quoting *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (¶14) (Miss. 2015)); *see also, e.g.*, *Thorp Fin. Corp. v. Tindle*, 249 Miss. 368, 375, 162 So. 2d 497, 500 (1964) ("The burden of proving the authority [of an agent] rests upon the person asserting the agency and relying upon said authority."). In the instant case, Tunica County Rehab is the party seeking to invoke the arbitration agreement. Tunica County Rehab alleges that Leroy's son Alta had authority to contract on Leroy's behalf because (a) Leroy lacked capacity and (b) Alta qualified as Leroy's "surrogate" under the Uniform Health-Care Decisions Act, Miss. Code Ann. §§ 41-41-201 through -229 (Rev. 2018). Therefore, Tunica County Rehab bore the burden of proving that the relevant requirements of the Act were satisfied.

¶45. Under the Act, "[a]n individual is presumed to have capacity to make a health-care decision." Miss. Code Ann. § 41-41-223 (Rev. 2018). Furthermore, "[o]ur Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted: by a *primary physician* determining *lack of capacity*." *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1159 (¶10) (Miss. 2010) (citing Miss. Code Ann. § 41-41-211(1) (Rev. 2009)). The Supreme Court has held that we must "strictly interpret the requirements of the Act" and require proof that the individual's *primary physician* made the necessary determination that the individual lacked

23

capacity. *Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 638 (¶20) (Miss. 2016).

¶46. An individual's "primary physician" is *either* "a physician designated by an individual or the individual's agent, guardian, or surrogate, to have primary responsibility for the individual's health care *or*, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility." Miss. Code Ann. § 41-41-203 (emphasis added). In this case, as the plurality holds, there is no evidence that Waller was ever properly "designated" as Leroy's primary care physician by anyone with authority to make that designation. Moreover, there is no evidence that Waller ever treated Leroy prior to his admission to the facility. Therefore, Tunica County Rehab bore the burden of proving that Waller "under[took]" "primary responsibility for [Leroy's] health care" at the time of Leroy's admission.

¶47. I agree with the plurality that the Act does not necessarily require a preexisting doctor-patient relationship and that it is possible for a doctor to "undertake[]" "primary responsibility for the [patient's] health care" at the time the doctor makes the statutorily required determination that the patient lacks "capacity." However, the problem in this case is not simply one of timing. Rather, the problem is that Tunica County Rehab failed to meet its burden of proof that Waller did in fact undertake primary responsibility for Leroy's health care at the time of Leroy's admission to the facility.

¶48. The easiest way for Tunica County Rehab to have met its burden of proof would have been with an affidavit from Waller, who is an owner of the facility and its medical director.

24

Waller could have stated in an affidavit that he undertook primary responsibility for Leroy's health care on May 23, 2012. However, Tunica County Rehab did not submit an affidavit from Waller or anyone else.

¶49.    In support of its motion to compel arbitration, Tunica County Rehab submitted only limited documentary evidence that fails to establish that Waller undertook "primary responsibility for [Leroy's] health care" on May 23, 2012. First, Tunica County Rehab relied on a form wherein Waller stated that Leroy was "unable to sign Nursing Home admission papers due to Dementia [and] Confusion" and did not "understand what he [was] signing." Waller signed the form on a line for the "Physician's Signature." While this form does indicate that Waller made some assessment of Leroy's mental condition at the time of his admission to the facility, it does not show that Waller undertook primary responsibility for Leroy's health care.

¶50.    Second, Tunica County Rehab relied on a form that Waller signed on May 23, 2012, to certify that Leroy was "appropriate for Medicaid long term care services." Waller signed the form as a "Physician." Again, there is nothing on the form to show that Waller undertook primary responsibility for Leroy's health care.

¶51.    Third, Tunica County Rehab offered a "Face Sheet" dated March 10, 2016—i.e., almost four years after Leroy's admission. The Face Sheet lists Waller as Leroy's "Primary Phys[ician]." However, the fact that a document listed Waller as Leroy's primary physician in 2016 simply is not evidence that Waller undertook primary responsibility for Leroy's

25

health care at the time of his admission to the facility in 2012.

¶52. Fourth, Tunica County Rehab submitted a few other forms such as assessments or nurse's notes that nurses or other employees of the nursing home completed on May 23, 2012. The employees who completed these forms listed "Waller" as the "Physician" or "Attending Physician." However, the fact that some other employees of the facility identified Waller as a physician or attending physician for Leroy also does not establish that Waller personally undertook primary responsibility for Leroy's health care.

¶53. In summary, the fact that Tunica County Rehab submitted several documents in support of its motion to compel arbitration should not obscure the fact that none of the documents establish that Waller undertook primary responsibility for Leroy's health care at the time of Leroy's admission to the facility. Absent such a showing, Alta could not act as Leroy's "surrogate" under the Uniform Health-Care Decisions Act, and the Supreme Court has held that we must "strictly interpret the requirements of the Act." *Tarvin*, 193 So. 3d at 638 (¶20). Because Tunica County Rehab bore the burden of proof on this issue, its motion to compel arbitration should have been denied.

¶54. Two final points about this case bear emphasis. First, although we must "strictly interpret the requirements of the Act," *id.*, those requirements are not overly demanding, are clearly defined by statute, and could have been satisfied in this case. Tunica County Rehab was not required to show that its contemporaneous records included an express statement that Waller had undertaken primary responsibility for Leroy's health care. Nor was Tunica

26

County Rehab required to rely solely on its own records, none of which directly addressed the key disputed factual issue in this case. Rather, Tunica County Rehab could have simply provided an affidavit from Waller stating that he undertook primary responsibility for Leroy's health care at the time of Leroy's admission to the facility. Such an affidavit would have been sufficient to meet Tunica County Rehab's burden of proof. Conversely, our Supreme Court has stated that "[t]he failure to present a witness who can be had, and who is presumed to be friendly to [a party], who knows [key] facts if any one does, raises a strong presumption that such facts do not exist." *Meridian Hatcheries Inc. v. Troutman*, 230 Miss. 493, 506, 93 So. 2d 472, 475 (1957) (quoting *Anderson v. Cumberland Tel. & Tel. Co.*, 86 Miss. 341, 353, 38 So. 786, 788 (1905)).

¶55. Second, although the plurality affirms the trial court's order in this case, this is not a case in which we may affirm based on deference to a trial judge's finding of fact. Indeed, as the plurality acknowledges, the trial judge's finding that Waller was properly "designated" as Leroy's primary physician was legally erroneous, and the trial judge made no finding on the key issue we address—whether Waller in fact undertook primary responsibility for Leroy's health care. In any event, with respect to this precise issue, our Supreme Court has stated that "we review de novo the trial judge's decision to grant a motion to compel, and we strictly interpret the requirements of the Act." *Tarvin*, 193 So. 3d at 638 (¶20). Thus, the plurality has made its own de novo finding of fact that Tunica County Rehab met its burden to prove that Waller undertook primary responsibility for Leroy's health care at the time of

27

his admission to the facility. Because the plurality's finding is based entirely on documents that do not address or prove that point, I respectfully dissent.

**McCARTY, J., JOINS THIS OPINION. McDONALD AND LAWRENCE, JJ., JOIN THIS OPINION IN PART.**

**WESTBROOKS, J., DISSENTING:**

¶56. Given the circular, symbiotic nature of the requirements imposed by the Legislature on those who need to make health-care decisions for their loved ones, I respectfully dissent from the plurality's interpretation of the law. Alta was not a surrogate, nor was Dr. Waller a primary care physician as set forth by Mississippi Code Annotated section 41-41-203 (Rev. 2018). Additionally, although I recognize that Alta could have fallen within the category of those who may serve as surrogates under section 41-41-211 (Rev. 2018), I do not believe he qualifies as such in this situation, nor do I believe Dr. Waller's diagnosis of dementia was tantamount to a finding of lack of capacity as directed by section 41-41-211. The decision of the circuit court should be reversed and rendered, holding that the arbitration agreement is void. In the alternative, the case should be remanded for an evidentiary hearing regarding the existence of a primary care physician.

¶57. My position differs from the plurality regarding Alta's status as a surrogate. The record is clear in this instance that Alta had no power of attorney over his father, nor had a court appointed him as Leroy's guardian or conservator; as such, for purposes of making a health-care decision for his father, Alta must have qualified as a surrogate per statutory law. Mississippi Code Annotated section 41-41-203(s) defines "surrogate" as "an individual, other

28

than a patient's agent or guardian, authorized under sections 41-41-201 through 41-41-229 to make a health-care decision for the patient." Under the Mississippi Uniform Health-Care Decisions Act, "[a] surrogate may make a health-care decision for a patient who is an adult or emancipated minor **if the patient has been determined by the primary physician to lack capacity**. . . ." Miss. Code Ann. § 41-41-211(1) (emphasis added). "This Court must follow the plain and unequivocal language of the statute and require that, in order for one to act as a health-care surrogate, there must first be a determination of a lack of capacity by a patient's primary physician." *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1159 (¶11) (Miss. 2010); *see also Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 637-38 (¶¶6-17) (Miss. 2016); *Forest Hill Nursing Ctr. Inc. v. McFarlan*, 995 So. 2d 775, 780 (¶8) (Miss. Ct. App. 2008) (stating that a primary physician must determine lack of capacity in order for a family member to qualify statutorily as a surrogate).[14] Upon reading the Mississippi Uniform Health-Care Decisions Act as a whole and applying the applicable statutes to the case at hand, as discussed below, there was no primary physician or a finding of lack of capacity. Because the predicate conditions were not met, Alta was not a surrogate in this instance.

¶58.    As recognized by the plurality, none of the documents submitted by Tunica County Rehab prove that Dr. Waller was designated as Leroy's primary physician. The plurality also holds that in the absence of the specific designation of Dr. Waller as the primary physician,

---

[14] There has been some negative treatment of *McFarlan*, but it was distinguished on other grounds than those for which we rely on it here.

the only other way to qualify him as the "primary physician" under Mississippi Code Annotated section 41-41-203(o) is to establish that Dr. Waller had undertaken primary responsibility for the patient's healthcare. While this is technically true, I deviate from the plurality's conclusion because I do not believe that the statute or prior caselaw contemplates the designation of a primary physician contemporaneously with a patient's admission. A primary physician must become such **before** a capacity determination is made and **before** any admission agreement is signed.

¶59. The plurality discusses and rejects the findings in *Tarvin*, where the Mississippi Supreme Court held that Dr. Thomas was not Tarvin's primary physician because

> [t]he fact that a physician has seen a patient twice in nearly three years [prior to his admission to the facility] is not proof that the physician has 'undertaken primary responsibility' for that patient's health care, especially when family members designated another physician as the 'attending physician' in an Admissions Agreement just three days later.

*Tarvin*, 193 So. 2d at 638 (¶18). Based on the Court's holding in *Tarvin* that sparse prior treatment was not enough to give primary physician status, it is difficult to see how Dr. Waller's contemporaneous "evaluation" of Leroy would allow him to be Leroy's primary physician under the statute. *See Est. of Bankston v. CLC of Biloxi LLC*, 240 So. 3d 456, 457, 459 (¶¶2, 15) (Miss. Ct. App. 2017) (Although not one of the issues on appeal, a doctor who treated the deceased for twenty-five days immediately preceding his death was his primary physician). There is no indication anywhere in the record that Dr. Waller had ever provided care or treatment to Leroy **before** the admission agreement being entered into on May 23,

30

2012. The fact that Dr. Waller (an owner of Tunica County Rehab) was willing to undertake the responsibility of becoming Leroy's primary physician did not make it instantaneously so absent a proper designation or treatment history. Leroy did not arrive at Tunica County Rehab seeking treatment of an emergency nature (e.g., a broken bone or a cardiac event); he had been released from Baptist Memorial Hospital-DeSoto and clearly had a prior treatment history. Given this prior treatment history, the fact that Leroy's estate denied that Dr. Waller was Leroy's primary physician, and Tunica County Rehab's assertion in its "Motion to Set Aside, Withdraw or Amend Requests for Admissions" that it did not object to arbitration-related discovery, the circuit court should have conducted an evidentiary hearing regarding the identity of Leroy's primary treating physician.

¶60. In reaching the ultimate conclusion that Dr. Waller was a primary physician, the plurality also attempts to explain away the fact that the designation of primary physician, the finding of lack of capacity, and the execution of the admission agreement all occurred on the same day. As the plurality points out, on the day Leroy was admitted to the facility, Dr. Waller signed a statement that read, "Leroy Humphrey is unable to sign Nursing Home admission papers due to dementia and confusion . . . [d]oesn't understand what he is signing." *Ante* at ¶6. The plurality finds the phrase "is unable to sign Nursing Home admission papers" to be a clear indication that the finding of incapacity was made by Dr. Waller **before** Alta signed the admission agreement. There is simply no way to determine from the record before us whether this is true. The admission agreement and the document

31

signed by Dr. Waller bear the same date. There is no time-stamp, pagination, or explanation to help us ascertain an accurate order of events. Dr. Waller cannot be considered a primary physician based on this logic.

¶61. As stated above, the record fails to show that Dr. Waller was Leroy's primary physician. I would also point to the fact that although the parties did not dispute Leroy's incapacity, the record lacks any evidence showing that Dr. Waller (even if he is considered to be a primary physician) properly determined that Leroy lacked "capacity" as that term is defined under section 41-41-203(d). *See Compere's Nursing Home Inc. v. Estate of Farish ex rel. Lewis*, 982 So. 2d 382, 384 (¶7) (Miss. 2008) (ruling "there is no evidence that Ms. Farish had 'been determined by [her] primary physician to lack capacity'"); *Magnolia Healthcare Inc. v. Barnes ex rel. Grigsby*, 994 So. 2d 159, 162 (¶15) (Miss. 2008) (Dickinson, J., concurring). "Our Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted: by a primary physician determining lack of capacity." *Estate of Bankston*, 240 So. 3d at 460 (¶14). Capacity is defined as "an individual's ability to understand the significant benefits, risks, and alternatives to proposed health care and to make and communicate a health-care decision." Miss. Code Ann. § 41-41-203(d). Furthermore, "[a]n individual is presumed to have capacity to make a health-care decision." Miss. Code Ann. § 41-41-223(2) (Rev. 2018).

¶62. Upon Leroy's admission to Tunica County Rehab, Dr. Richard Waller (who is both

32

an owner of the facility and its medical director) signed a statement that read, "Leroy Humphrey is unable to sign Nursing Home admission papers due to dementia and confusion . . . [d]oesn't understand what he is signing." The plurality finds the phrase "is unable to sign Nursing Home admission papers" to be a clear, conclusive indication of incapacity. The Mississippi Supreme Court addressed similar circumstances in *Reed*, 37 So. 3d at 1159 (¶¶9-11), where Annie Reed was described by the doctor who held himself out to be her primary physician as being "confused" and requiring assistance with daily living. The Court found this to be insufficient evidence of lack of capacity. *Id*. at (¶¶10-11). Similarly in *McFarlan*, 995 So. 2d at 780 (¶8), the assessment form completed upon McFarlan's admission showed moderate impairment, memory problems, altered perception on some occasions, and inability to maintain basic hygiene by herself. But we held that the intake form failed to meet the statutory requirement of a determination of incapacity at the time of her admission. *Id.* In *Holmes v. O'Bryant*, 741 So. 2d 366, 374 (¶38) (Miss. Ct. App. 1999), although the standard used to determine lack of capacity is different than the present situation, the fact this Court stated in *Holmes* that the presence of dementia is not determinative of mental capacity (or a lack thereof) is on point. Specifically, we upheld the chancellor's finding that a decedent, Louie, was capable of determining how he wished to bequeath his property where there was "no evidence in the record to state what, if any, effect [senile dementia of the Alzheimer's type] would have upon [Louie's] ability to know the nature and extent of his property and to have the mental capacity to execute the deed in question." *Id.* The plurality's reliance on

33

*Estate of Bankston* is misplaced. There, just like in the case currently before us, there was no finding of lack of capacity in the record; there were only medical records listing symptoms and diagnoses. *Est. of Bankston*, 240 So. 2d at 459 (¶13). This Court went on to state that "[m]edical records indicating . . . diagnoses and symptomatology are not the equivalent of an affirmative determination by a physician that the patient lacks capacity as defined by statute." *Id.* Dr. Waller did not make a finding of incapacity per the statute; he merely listed a diagnosis and a symptom. Even taking into account all of Leroy's symptoms and the diagnosis of dementia, there is no statutory authority for a court to make a finding of incapacity that the doctor for some reason could not or did not make. The statute dictates that the finding of incapacity must be made by the primary physician, and that simply did not happen in this instance.

¶63. Lastly, I do not profess any type of medical expertise, but the Mayo Clinic states that dementia is not a disease; rather the word is used to describe a wide range of symptoms.[15] "No single test can diagnose dementia," so doctors may run a battery of tests, including cognitive and neuropsychological tests, a neurological evaluation, lab work, brain scans, and/or a psychiatric evaluation prior to making a diagnosis.[16] Prior to the date of admission,

---

[15] Mayo Clinic, Health Information, https://www.mayoclinic.org/diseases-conditions/alzheimers-disease/expert-answers/alzheimers-and-dementia-whats-the-difference/faq-20396861 (last visited Oct. 5, 2021).

[16] Mayo Clinic, Diseases and Conditions, https://www.mayoclinic.org/diseases-conditions/dementia/diagnosis-treatment/drc-20352019 (last visited Oct. 5, 2021).

Dr. Waller had never provided care or treatment to Leroy. Additionally, there is no record of any examination, test, or treatment by Dr. Waller prior to his declaration that Leroy had dementia and was confused—which is not tantamount to a finding of lack of capacity. Clearly, any examination or care provided by Dr. Waller (on the day he is alleged to have been simultaneously designated as primary physician, found Leroy to lack capacity, and executed the admission agreement) was cursory at best. As evidence of the superficial nature of Dr. Waller's examination of Leroy, the medical assessment documents submitted by Tunica County Rehab contain several discrepancies regarding Leroy's condition: Leroy was noted to have intermittent confusion and dementia, but it was also indicated that he was alert, oriented, pleasant, cooperative, and had quick comprehension. The plurality misses the point when it states that these observations were made by "non-physician screeners" and fail to indicate whether they relate to Leroy's "situational orientation." The point is that no observations of Leroy's condition were recorded by Dr. Waller. There is absolutely no evidence that Dr. Waller conducted a thorough examination, much less undertook any testing before stating that Leroy had dementia that had progressed to a stage that would give rise to a finding of lack of capacity.[17] Additionally, a close review of the same documents shows that not only were they all prepared on the same day, those with a time listed show that they

---

[17] The plurality's interpretation of the applicable statutes would open the door for "loved ones" to have family members committed to nursing homes or other healthcare facilities against their wills by essentially giving physicians the ability to rubber-stamp a "diagnosis" of dementia for which no adequate or thorough testing has been done, when that is the diagnosis presented at the time of admission.

35

were prepared at the exact same time—2:30 p.m. Even if Dr. Waller was somehow miraculously able to bypass the normal tests and determine the existence and stage of dementia on the spot, he did not make a specific finding of lack of capacity as required under Mississippi Code Annotated section 41-41-203.

¶64. In the case before us, not only is there no evidence that Dr. Waller was Leroy's primary physician, there is also no evidence that Dr. Waller (or any other physician) found Leroy to be incapacitated. Therefore, Alta did not have authority to act as a health-care surrogate.

¶65. For these reasons, I respectfully dissent.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION. LAWRENCE, J, JOINS THIS OPINION IN PART.**